Case number 21-5203, Valancourt Books, LLC, at Valance versus Merrick V. Garland, Attorney General, and Cheryl Perlmutter, in her official capacity as the Registrar of Copyright of the U.S. Copyright Office. Mr. McNamara for the appellant, Ms. Marner for the appellate. Good morning, counsel. Mr. McNamara, please proceed when you're ready. Thank you, Your Honor. May it please the Court. This case began when the government sent Valancourt Books a series of demand letters threatening it with tens of thousands of dollars in fines because it had published books with copyrightable material without providing copies of those books to the government for its own use. That demand works at taking and it violates the free speech laws of the First Amendment by imposing a burden on protected speech, and it does these so clearly, apparently, that the government expends most of its energy running away from the plain language of its own demand letters and the plain language of the underlying statutes. The government instead would have this Court focus on its new litigation position, announced for the first time in its summary judgment briefing below, that Valancourt can now comply with this demand by depositing e-books, electronic books, instead of physical books. And I don't think that e-books get the government out of the box here for at least three reasons. One, as to Valancourt's future activities, there's a huge voluntary cessation. There's been no change in law or policy or regulation. There's no barrier to the government tomorrow demanding a physical copy of the next book. Indeed, don't their statements indicate that they can switch back? Yes, Your Honor. There's nothing to stop the government. No, no, but I mean, isn't there a statement in the record that the government makes it clear that they can switch back to the hard copy? No guarantee that the electronic version will be the only requirement? There is no guarantee, Your Honor. There's really nothing in the record about the government's position here at all. It just comes from their briefs. The only thing in the record is a confidential settlement offer that I think is not really properly before the Court. But even if there weren't a voluntary cessation problem, as to the books the government's already demanded, the record also reflects that Valancourt can't provide electronic versions of all of them. There's at least a five-year span where Valancourt no longer has the underlying electronic files. So as to those, we're still talking just about a demand for physical books. And even if this case were just about e-books, and I don't think it is, a demand for e-books would still work a taking and still impose a burden on Valancourt's First Amendment speech. I think it still works a taking because Valancourt sells e-books. It sells them at retail. And so the character of the government action here is a demand that says, that thing that you're selling at retail, give it to us for free so that we can keep it forever. I think that works. It does look different, though. I mean, of course, you're making the argument that it's still a if it's purely electronic. But it does look different because there's not the same scarcity issue with electronic documents as there is with a physical document. There's actually a transfer or something when it's a physical document. And so it would raise more complicated questions, it seems to me, under the takings clause, if we're talking about a purely electronic medium as opposed to a physical. I do think it would be more complicated, Your Honor. I think that the extent to which the e-book, the file itself, is property. And I think it would be that states are a bit in flux on the status of electronic files, understandably. But the case law is clearly trending in favor of recognizing that electronic files are property. It can be trespassed upon, be converted, even be forfeited. And all those cases, I think, suggest that a demand for a particular e-book, even if you can make more copies of the e-book, is still a taking. But even if it weren't a taking, it's still a First Amendment verdict. The record reflects that Ballantyre would have to spend hours on regulatory compliance instead of on its core mission of publishing books. And the only reason it would have to spend hours on regulatory compliance is that it published books that contained copyrightable material. And publishing copyrightable material simply isn't something the government can punish. It isn't something to which government can attack regulatory obligations. Well, I mean, that's one way to analyze it. But why do you put publication and copyright together? They're inextricably tied, they're not. I mean, that's the favorable way for you to argue the case. But we're really talking about, the Supreme Court said a long time ago, this is a government-conferred exclusive right. The only thing that's changed is now that the publication and copyright dates are the same. And in my mind, analytically, I'm struggling to figure out why that should make a difference. The rule is, this is a government-conferred right for which they're making a reasonable request. And the Supreme Court has said, yeah, that's fine. And as I'm understanding your argument, the difference now is maybe this Vern thing, which I think can't get you where you want to go, and also the fact that the copyright and publication are now on the same date. And my response to that preparing is, so what? Well, Your Honor, I think the difference here, copyright certainly is a government-created benefit. You don't start with it like the right to plant, in the case that you all keep arguing. It's more like Monsanto to me. You're not born with the right to copyright. You're born with the right to publish. That's true. But not with the right to copyright. And you only get that by virtue of the government conferring it. And the cases seem to suggest at least as I'm preparing your side of the case, seem to suggest that the government can certainly condition. I agree with you to a point, Your Honor. The government certainly can condition copyright. The government could adopt a statute that says copyright is conditional on depositing books or on paying a fee or on anything it wants. The key here is the government hasn't done that. Section 407 explicitly says that mandatory deposit is not a condition of copyright. If it's not a condition of copyright, then it's not a condition on that government benefit you're discussing. Instead, copyright is automatic. The word the statute uses is subsists. Copyright subsists the moment a new idea is written down in any fixed medium. And that means that copyright is instantaneous. It's not offered in exchange. It's a background regulatory principle. The instant Ballantyre writes a new footnote or a new author bio or asks a friendly academic to forward to an old novel that it's republishing, copyright instantly adheres. Well, we know that has to be the case because the government is making the argument that you can avoid the deposit requirement if you disavow copyright. And you can only disavow copyright if the copyright already existed and the copyright existed at the moment of creation. So I think the government buys into the notion that there's a sequential dynamic going on here where copyright attached at the moment of creation. The publication, which may or may not come later, is what triggers the deposit. I don't think disavowal really gets us anywhere here, Your Honor, for two independent reasons. One, there is no statutory mechanism for disavowing copyright. Copyright abandonment is a judge-created defense to a copyright infringement lawsuit. It's akin to logics. It says if you've acted like this isn't yours, we're not going to hear your claim. Right. I know that you have your on how disavowal isn't a real option, and I think there's something to it, and I want to hear from the government on that. I'm only making the point that the conceptual framework you laid out, there's no dispute about that because the government's argument, I think is a favorable point. The government's argument that your client can avoid the deposit requirement by disavowing copyright necessarily presupposes that copyright already exists. That's right, Your Honor, and I think there's another thing lurking in the government's argument. Government doesn't acknowledge, which is the burden that's imposed. The way Valancourt operates is it will go to a friendly academic and say, will you write a foreword to this novel that we're repurposing and republishing, and the academic writes it and informally license it to Valancourt. As I understand the government's argument, that transaction was illegal. That transaction should have been formalized where the academic could formally disavow the copyright whatever process that entails, and the government has changed its mind about what that process looks like, or Valancourt should have somehow publicly proclaimed that the academic didn't have a copyright. Our position is that it's perfectly legal just to solicit someone to write something and then publish that without attendant regulatory compliance burdens, and those regulatory compliance burdens are enormous here. There has been no dispute in government's demand here would cost Valancourt endless hours of regulatory compliance, and as to the demand for physical books, thousands of dollars in collecting these books it doesn't even have. Can I ask you as a conceptual matter? I take it that you don't disagree that if the copyright laws existed as they did in the 1800s, that that was a voluntary exchange, that the deposit requirement is voluntary exchange. Absolutely. There's nothing wrong with a deposit requirement that's tied to the existence of a copyright. I think that's right, Your Honor. I think maybe the best way to illustrate that is to contrast section 407, which we're challenging, with section 408, which we're not. Section 408 is the registration statute that says if you want to register a copyright, something you can actually enforce in federal court, you have to exchange your property. You have to exchange a copy of the work. That's an exchange. That's a trade, and in fact, in Cedar Point, the Supreme Court specifically said that a license permit or registration is the kind of thing the government can trade. So to follow that through, if the state of the law beforehand was not a taking, and then what happens is Congress amends the law, so not to say that copyright arises at the moment of creation, and the deposit requirement triggers at the moment of publication, but to say that we're worried about the cost of the deposit requirement, of it being the ultimate sanction of losing copyright protection. So we're going to impose a lesser cost. But it's still not something that triggers only upon publication. It's still something that affects the existence of the copyright to begin with. That would still be a voluntary exchange of the kind that Monsanto said wouldn't be a taking. I think that's probably right, Your Honor. If Congress in Section 407, instead of saying mandatory deposit isn't a condition of copyright, said it's a condition subsequent to copyright, that too could be seen as a voluntary exchange. The problem is copyright subsists automatically, and upon the act of publication, Ballant Court incurs these obligations to provide copyright to the government, and I think that does go right to the heart of Monsanto. In Monsanto, the Supreme Court clearly says, look, no one here has challenged that the government can just prohibit selling these hazardous chemicals, can license it however it wants. And so long as that's true, demanding property in exchange for the license isn't going to work a taking. But the government can't prohibit publishing books. It can't prohibit publishing books that contain new ideas in them. That is as fundamental as an American right that exists, and I think that's the problem with the government's position here. It's not a condition on copyright. It's not an exchange for small publishers like my client, in order to make sure the government doesn't have to pay for the books it wants, and I think that really illustrates the overbreadth problem with what the government's doing, is that to avoid paying however much it would cost for the books the government actually wants, it's imposed a burden on everyone who publishes copyrightable material. The government, I think, has run away from the idea that this is a burden on copyrightable material, but that is the justification in their demand letters that is still, as of this morning, the Copyright Office's explanation of Section 407 on its website, I checked this morning, it still says the law requires two copies of the best edition of every copyrightable work published in the United States. And what it gets is a flurry of books that it doesn't want. There's no question in the record that the government is away tens of thousands of books a year, and that it destroys so many books that it cannot bother to keep count of how many it's in service of just avoiding paying for things that are freely available for sale in retail. With the purpose of transferring the burden of maintaining a public library, which we concede is a valid public government interest, but transferring the cost of that from the public onto the backs of publishers who have done nothing wrong beyond publishing copyrightable information. If this was an opt-in scheme, is the result different in your view? If this was, if copyright was an opt-in scheme? Unquestionably, Your Honor. Unquestionably what? If copyright were an opt-in scheme, the government could condition it on any reasonably tailored condition it chooses. So that's your answer to my starting question. When they put the two together, they're effectively regulating the rights of publication. That's exactly right, Your Honor. You combine automatic copyrights with obligations to become a public library. And so the instant you publish automatically copyrighted material, what you've done is make it illegal to publish a book without fulfilling your attendant regulatory obligations. And that violates both the First Amendment. Can I ask you, we will give you some time for rebuttal. As between the First Amendment claim and the takings claim, put aside the First Amendment claim that has to do with enforcement, because it seems to me the remedy, if you were to prevail on that, would be different. Because that's just to end the enforcement practice that raises the question. I agree. But under the broader First Amendment argument, which is that even if you assume it's content neutral and you just go to the statute, is there a difference between the takings claim and the First Amendment claim? I think the only difference, Your Honor, is to the extent the court decides to address the e-books question, the burden on the publisher is roughly the same, whether they have to go through compliance to deposit and record the electronic books. And it might be easier to resolve the case on the First Amendment basis, because then I think e-books fall out entirely. You don't have to address my argument about whether a demand for an e-book or a piece of software or a subscription website is a taking, because the only question is whether it's a burden on the publisher. Right. OK. So then in terms of physical copies, let's just assume we're just ignoring e-books altogether. In terms of physical copies, is there any difference? I think they work the same. And I think the district court's analysis largely worked the same, where it rejected our takings claim on the theory that this was an exchange, this was a condition, and then it rejected our First Amendment theory on the grounds that the government can impose these burdens because this is an exchange, it's a condition. Once the conditional nature of copyright falls out, I think we prevail on both for, frankly, largely the same reasons. And then the flip side is also true. So, for example, under 408, which you acknowledge is a voluntary exchange of the kind that doesn't affect the taking, it also, therefore, doesn't affect any First Amendment law. Absolutely. Under 408, you're free to publish anything you want. You just don't get the special government benefit of an enforceable registered copyright, and the government is free to do that without burdening or protecting you. Let me make sure my colleagues don't have questions for you at this time. No. Thank you. Thank you very much, Robert. Thank you. May it please the Court, Laura Myron, for the government. The demand requirement has been in the fabric of copyright law since the founding of the Supreme Court. The only question before this Court today is whether the changes Congress has made since and make it easier for copyright holders to get and maintain copyright protection have somehow rendered it unconstitutional. As a practical matter, for most copyright holders and owners of the exclusive right, the exchange works exactly the same way. The government confers the benefit of copyright protection, which allows you to publish your work with the exclusive right to disseminate and distribute copies. It allows you to put in the front of the book, as it has, a notice that says any use, copying, publication, whatnot of this work shall be a violation of federal law. And it allows you to register your copyright if someone notwithstanding that threat infringes on it and copies your work, and sue them for injunctive relief. In exchange for which, most copyright holders are happy to send the government to copy. I just would have you believe that because copyright protection now adheres at the moment to the creation and the work, which Congress did in order to make it easier for people to secure copyright protection and more difficult for them to inadvertently forfeit it by not correctly publishing the right notice, that somehow copyright protection has become an unalienable right that you can't get rid of if you don't want to comply with the clause. That's simply contrary to the way courts have understood copyright for decades. It is well established that you can abandon a copyright. It's true that in the cases that have come up, it's a little bit murky because usually the question is presented to the court in the context of someone who's suing to enforce their copyright protection. It's significantly easier in the context of 407. Can you win on the takings claim if there isn't a robustly available, what you're calling abandonment option? I think that's somewhat of a counter-hypothetical that it is clear that you can abandon a copyright. It would be astonishing that this court... Could you win if that didn't exist? Then we'll get into whether it in fact exists. But could you win on the takings claim if there wasn't a very readily available way just to say if you're a publisher, I actually don't care about the copyright. Well, look, the Supreme Court said in Wheaton that when the legislature is about to vest an exclusive right, not their inventor, they have the power to prescribe the conditions on which the right shall be enjoyed. I don't disagree that it might be a tougher question, but I do think that Wheaton would still conclude that this provision would be constitutional. And again, for purposes of 407, setting aside whether or not the Copyright Office doesn't comment on whether any overt act that manifests an intent to abandon copyright is sufficient for infringement purposes, but for purposes of 407, any overt act would suffice, including responding to the demand letter saying, I do not want my copyright protection in this work. If counsel for plaintiff were to stand up and rebuttal and say, as a representative of the plaintiff, I am authorized to indicate that the plaintiff is foregoing copyright protection in the demand work, that would take the plaintiff out of the statutory provision, which applies, and this is from the text of 407, only to the owner of copyright or the exclusive right of publication. So if you are no longer the owner of copyright and the requirement in 407 does not apply to you. Why is this nowhere? This has never come up other than in the briefing in this case, as far as I know. Because nobody, as far as we can tell, wants to give up the benefits of copyright protection, which are myriad. You have the Association of American Publishers, as amici in this case, telling you that giving up copyright protection would be economically devastating for the publishing industry. So it's true that it doesn't come up very often that somebody wants to abandon their copyright and is unable to do so. I mean, there are certainly people who publish works, you know, with disclaimers that say this work is not subject to copyright protection, copy, you know, as you like. But it is true that it doesn't come up often outside the context of infringement litigation, because by and large, copyright is very beneficial for copyright holders. It extends, as I mentioned, a litany of benefits, including the right to exclude from publication of the work, the right to control the dissemination of your work, to profit from publication thereof. And the Supreme Court has recognized that it's an economic driver of the most creative expression and promotes the things that the Copyright Act is intended to protect, and that it's reasonable to condition the exchange of that very valuable government benefit on the submission of two copies of work. And you think that the freely available disavowal, abandonment, to the extent that someone could just stand up in court and do it, that's consistent with the statute that says that copyright protection subsists? Yes, Your Honor, I mean, the plaintiff is asking you to read that statute to say that somehow copyright protection, because it adheres a publication of the work, even if you don't put the requisite notice in, that somehow it has become an unalienable property right. That's anathema to the way we understand property law. Certainly there isn't any indication that Congress's use of that language was intended to make it so that no one who didn't want copyright protection could abandon it. And the plaintiff has brought both, I think it's important to note, a facial challenge and an as-applied challenge. There's certainly no question that as applied to the plaintiff, if they wanted to abandon this, if the government has said this, both in this litigation and elsewhere, if copyright protection no longer adheres to the work, if you are no longer the owner of copyright with exclusive right of publication, that 407 would not apply. So as the statute as applied to plaintiff, it certainly wouldn't be unconstitutional in that regard, because they have not sought to abandon their work and been unable to do so. And as a practical matter, as I noted, the vast majority of publishers do opt in, do want to maintain their copyright protection, even when faced with a demand letter. You mean they don't opt out? I'm sorry, Your Honor? You mean they don't opt out, but they do opt in, not out. They get it automatically. They get it. Well, I mean, their argument is essentially it's a force to take. And I think what they're saying is the force to taking is really a regulation of a right to  publish. So if I could, I think to say two things in response. The first is we usually think of takings as instances in which you have no choice but to comply with the government's demand for your property. You might be able to get compensation from the government for turning over the property, but you don't have a choice to say, actually, I don't want the government benefit that you're offering, and I don't want to comply with the demand, and so I choose not to do so. But the second is that, as I said, they're suggesting somehow that the fact that the copyright adheres to the work beginning makes it unalienable, and that simply can't be correct. And as I said before, I suppose even if you were concerned that there was somebody out there who did want to abandon their copyright and was unable to do so, that might give rise to a particular as-applied challenge in which you could consider in that circumstances of that case, whether there was a constitutional problem. But certainly, that's not the plaintiff you have before you today. And the plainly legitimate sweep of the statute is broad enough, as I said, the vast majority of publishers do want the myriad protections of copyright in order to deal with the plaintiff's facial challenge. What about the notion that there's a $125 fee for abandonment, at least in some contexts? Is that just not a thing? Well, the $125 fee goes with a recordation of a document in the Copyright Office that you have noted. Is it a way that you could abandon your copyright? It's certainly not the only way. The government has never said that's the only way, and that would be contrary to decades of case law that say any overt act manifesting an intent to disclaim a copyright suffices for purposes of abandonment. And certainly... So why does that option... Why would anybody take the $125 option if you have a free one? I don't want to guess, but I suppose if you wanted to address both the question of abandonment for purposes of 407, for the Copyright Office, and also more publicly for purposes of future infringement copyright and whatnot, that would be available. The recordation fee applies to any document that you would record with the Copyright Office, so it's not just for cases in which someone wants to disclaim their copyright. It's just a mechanism for engaging in an overt act. As a neutral listener, that's a very strange answer. Why would I ever want to pay $125 if all I want to do is to say I don't want this thing? You say I was born with it, and as soon as I publish, I'm stuck. I'm stuck, meaning the least I have to do is give you $125 to be unstuck. Certainly not. I apologize if I was answering a different part of the question. You don't have to do that, and as far as we know, people don't do the recordation as means of abandonment. If you wanted an answer for how to manifest an intent to abandon, you could file something with the Copyright Office, but as I said, it's like going to the registrar of deeds in a county. You're saying this is one way you can technically do it in order to get it recorded for time immemorial, and someone can go check, and they can see them. Yes. If you just want to disavow it without worrying about whether somebody could check on it, you can do it for free. How do you do that? You could do a number of things. Any overt act manifesting an intent to disclaim copyright, you could respond to the Copyright Office and say I do not want the copyright in this demanded material. Who does it go to? Does it have to go to? If you just send an email to your friend saying I wish I didn't have a copyright. The Copyright Office, in order to retract the demand letter, would need to be made aware of it, but in response to a demand letter, if you write an email to the Copyright Office and say I have disavowed my copyright, I have abandoned my copyright, the Copyright Office respects that for purposes of 407, and certainly that's within reasonable understanding of the statute of the owner or exclusive right of publication in a work in the United States. If you are no longer the owner or exclusive holder of exclusive right of publication, then for purposes of 407, you are no longer subject to the requirement. Again, a painter has never sought to abandon their copyright. In fact, they've done everything. Of course they want to. I mean, I think everybody would want to retain the copyright if they can. Yes, Your Honor, and I think that highlights that this is a valuable government benefit that you are receiving in exchange for the copies of the work in the same way that the court recognized in Wheaton. I would also point the court to the Supreme Court's decision in Washingtonian Publishing in which the Supreme Court recognized that forfeiture, inadvertent forfeiture of copyright was a different punishment and interpreted the timing provisions of the copyright scheme as the positive crime scheme existed at the time in such a way to make it easier for copyright holders to satisfy the requirement by interpreting promptly. If there is this liberally available abandonment option that can just take the form of an email to the Copyright Office, is that irrevocable? The Copyright Office, for purposes of 407, the Copyright Office doesn't take a position on whether that would be sufficient or effective for infringement litigation. It doesn't say that any overt acts manifesting an intent to abandon because that's for courts to decide, but certainly for purposes of 407, if you are no longer the owner of copyright or the exclusive right of publication, which you divest yourself of, as courts have said for decades, by an overt act manifesting an intent to abandon your copyright, that for purposes of 407, I think it would be sufficient. If someone is the owner and sends the email and then subsequently files an infringement action, what's going to happen with that email? Well, they're publicly available documents. I suppose you could get it through a FOIA request. There might be a hard question of whether it's sufficient for purposes of infringement. Right. I mean, if you paid $125, obviously, it's publicly available, but if you don't do that, if you just send an email... But it's a public record. Someone would have to file a FOIA request in order to... The subject of the infringement action would have to file a FOIA request to know whether... I think there are two separate questions. One is the effectiveness of abandonment or infringement litigation, and the second is whether or not you've sufficiently taken yourself out of the exchange provided in 407. And certainly for purposes of 407, the email would suffice, and that's enough to dispose of plaintiffs, both as applied and several times in the hypothetical realm, because plaintiff has not sought to abandon its copyright and, as far as we know, hasn't pointed to anyone else that they think have sought to abandon their copyright and been unsuccessful in doing so. I suppose, as I said before, you might have a more difficult as-applied challenge in that particular case, but that case doesn't come up because most people want an exchange being offered by Section 407. Right. I'm just saying that if somebody can easily, and then it actually doesn't have the replicability or permanent costs, then, yeah, you could do that because you could just say, I'm abandoning it for 407 purposes. I'm not telling you whether I'm abandoning it for any other purposes, but at least this means that I don't have to send a demand copy. Again, the Copyright Office doesn't only concern itself with whether your abandonment is effective for purposes of 407, and certainly you could understand, as a constitutional matter, the language of 407 to mean that an owner of copyright or a holder of exclusive right is someone who has not engaged in an overact to abandon their copyright, and I think that's enough to resolve the question before the court today. There may be more difficult questions if that person were to turn around and try to bring infringement litigation. But again, the plaintiff hasn't done that. In fact, the plaintiff has done everything in terms of his hold of the exclusive right of publication, of publishing the notice that threatens that any use of copying of this work is a violation of federal law, and steadfastly refusing to abandon its copyright. Can I ask you this question? So just shifting to the First Amendment for a second. So suppose that, just hypothetically, I know you'll resist this premise, but suppose that we don't give you the benefit of the liberal abandonment option that you're resting your copyright on, and then it doesn't automatically transfer over to the First Amendment either, because that's also a principal force of your argument on the First Amendment is, look, there's no burden here because it's just voluntary to begin with. It's just like 408. What's the problem? And I think the opposing side agrees that if it were like 408, there wouldn't be a First Amendment problem either. But suppose we don't, we're not joining you on that. Then what's the argument, if there's not the liberal abandonment option available, what's the government's argument as to why a burden imposed upon publication is valid? Even putting aside content, just suppose it's content neutral. It's just anybody, it applies to any content whatsoever, but it's still a burden imposed on publication. And it has to be justified by the government, even though the government could pay for the copies, even though the government is destroying, the Library of Congress is destroying, for totally understandable reasons, a bunch of books. It just seems like there's a benefit burden calculus that is difficult for the government based on what's in the record of this case. If you reject the threshold submission that you have, which is this is not a burden to begin. The requirement in 407 applies to the owner of copyright, and the requirement that you deposit copies would still be a condition on which the copyright shall be enjoyed. Congress doesn't need to provide publishers with copyright. There's no background principle which you are entitled to publish with the protection of copyright. In fact, the Supreme Court in Wheaton noted that copyright is entirely a creation of statute. And so the demand requirement would still, the deposit requirement would still run with the benefit of copyright. But it only triggers on publication. So it doesn't trigger on copyright, because copyright already exists no matter what. It only triggers on publication. And it just seems to me that it's a textbook First Amendment, at least a serious textbook First Amendment question, if there's a burden imposed on a party by virtue of publication. Well, look, I think, you know, some of what you're getting at is some of the tension between the copyright, you know, the exclusive right of publication, the copyright scheme, and the First Amendment. And the courts have long recognized that copyright, which, you know, limits the publication of certain things and, you know, provides exclusive rights is actually good for the First Amendment. They work in concert in order to, as I said before, bolster an economic market for publishing. So I don't think it's, I mean, I don't think it's fair to read this as just an act or a burden on publication. And certainly that's because anybody could publish something that says, you know, I do not, like, even if you set aside the question of whether once you've received copyright, whether you can abandon it, excuse me, I don't think there's any dispute that if you publish something that says, this book is for public use, I am not claiming copyright, that that would not be subject to copyright protection if you do that. And if you do that, you can publish anything you want, say anything you want, you know, without running afoul, you know, without encountering the burdens of 407, and then, you know, of course, without running afoul of the First Amendment. And I would also note that, you know, it's not pointed to any speech or First Amendment activity that has been chilled by virtue of this requirement. They can't find anybody, as far as we know, the American Association of Publishers, Association of American Publishers has not come in and said, you know, people are being you know, chilled from publishing by virtue of these provisions of the Copyright Act, because of the way copyright law operates. And it wouldn't be a First Amendment problem, because it's a burden on, as I said, the provision associated with the provision. Make sure my colleagues don't have additional questions for you. Thank you. If you would like, I'd be happy to address the court question in the supplemental order about per se versus electronic takings. On per se versus regulatory takings, if we have questions about that, I don't. Thank you, counsel. Mr. McNamara, we'll give you three minutes for rebuttal. Thank you, Your Honor. Just two very quick points. First, I actually agree with my friend from the government that most publishers do want the benefits of copyright. And we know that because most publishers choose to register their copyrights under Section 408 and trade their books under 408 instead of depositing their books in exchange for nothing under 407. This is a Joint Appendix 118, but the Copyright Office gets more than four times as many books through 408 as it does under 407, because those are the people who want the benefits of an enforceable copyright. And second, just a word on abandonment. If abandoning copyright were easy, Your Honor, then the government would have been able to consistently describe the abandonment process throughout this litigation. It hasn't been able to do so. Its position below, the position adopted by the district court, was that we had to pay $125 to record our abandonment. There is nothing at all in the record that suggests the Copyright Office treats abandonment in the way that we were discussing this morning. Just absolutely nothing. Well, let's assume they do. Even so, Your Honor, if they did, I think that still creates a massive First Amendment burden. My friend from the government... Well, start with the taking thing first. One, I'm not sure I understand the taking. Assuming abandonment is straightforward. Send an email. If they send you something saying you owe us something, you say, I don't want it, etc. It's straightforward. It's as straightforward as you can imagine. What's the takings claim? The demand itself is still a taking, and the question is just how much effort we have to put forth to escape the taking. In Horn, they could have stopped selling raisins. Here, perhaps there's some amorphous process we could go through to abandon the copyright. But crucially, we can't abandon these copyrights because we don't own them. As I said before, a lot of the copyrights here are automatically attached to an assistant professor of English at a university somewhere in the country. To abandon the copyright, Ballinport would have to go to that professor and urge him to undertake whatever process the government has now decided counts as abandonment, file that with the government, and thereby remove the automatic copyright from the forward of this book. That is a burden on Ballinport's First Amendment publishing activity. We're going to the First Amendment, and I'm trying to get your position. If abandonment's not an issue, I don't see why taking is. I also think it's a burden to escape the taking, because in any takings case, there's something that you can do to escape the taking. Here, it's always been clear we could avoid giving our property to the government by paying a fine. Our position is that forcing us to pay a fine is too much of a burden. Or you cannot publish. Or we could not publish. We think forcing us to forego the right to publish books is too much of a burden. So too, forcing us to track down and enter into formal agreements with anyone who has ever created any written word for a Ballinport book imposes a burden. The demand for physical property is still a taking, and it still functions as a burden on our fundamental right to publish books containing new language. Let's take the hypothetical. Let's assume I'm not going to get involved. If I get a request to pay a fine or whatever from the government, at that moment, I will write a note back to them saying I don't want this. It's that thing other than wait to see whether the government dares to say you owe them something. And at that moment, you say, I don't owe you anything because I don't want this copyright. I didn't ask for it. You say it was automatically there. I don't want it. And I'm not paying you a fine. I still think there are two problems, Your Honor. One, that's contrary to statutory text that says our deposit obligations arise three months after publication. There's nothing to suggest we can retroactively eliminate them years later when we get that record. That's not the system Congress set up in the statutory text. And two, we cannot disavow things we don't know. What that system would say is that it's no longer legal to have these informal arrangements with people to write illuminating footnotes or interesting forewords. And yet, I think we have a fundamental right to have people write interesting forewords and illuminating footnotes without engaging in regulatory compliance. And I think the only dispute we have with the government here and what's shifting in the government's shifting litigation positions is the scope of that verdict, how much regulatory compliance we have to do. But if all we're doing is publishing books, if all we're doing is just exercising a right that's existed since Gutenberg, the government can't impose on us. The only hope they have is that we said something new, that we said it in public. So can I, I'm trying to construct the copyright. I take that point. So I understand the complication. But if we can construct the hypothetical where the demand requirement only kicks in where you're asserting your own copyright. And if that's really abandonable, then is there a problem? Is there a takings problem? I think in that hypothetical, I would say there is still a takings problem because you have to something to abandon the copyright. I guess if we embrace it, even if it's just sending an email, even if it's just sending an email, if I forget to send that email, I'm subject to fines. That's certainly a much smaller, but then when you get the follow-up notice saying you forgot to respond and then you can say, okay, I meant to tell you this last week, I'm telling you now. So, and I, so I think the strongest version of the hypothetical is an email that says, you have to deposit these books. And if you don't deposit these books, we will assume you've abandoned your copyright. That imposes no obligations on us. That's the easiest way to escape the taking. And I think that actually wouldn't work. It doesn't actually demand the book. We can freely escape it. The only problem is it violates section 407 because that. Right. Put that aside. I mean, let's just assume the government hasn't interpreted very much. I think you're right. Your honor, that wouldn't be a taking because that's not actually a demand for books on pain of either punishment or some other burden we'd have. And then if you just flip it a little bit so that it's not, they don't put the bonus, they don't assume that you're abandoning, but they just require you to do something trivial to abandon, which is just respond. Like you get those texts that say, send them one, if you want to keep your reservation, that kind of thing. Yeah. I think at a certain point, your honor, there probably is a burden the court could say was de minimis. I can't offhand think of a taking space where the government said you can escape this taking by undertaking a de minimis burden. I would anticipate the Supreme Court would say that the question presented itself. I just don't think we have a case of the de minimis burden. And then query what the compensation would be if really there's what the just compensation would be if there's really nothing to the burden. But I think your main burden point is that there's copyright that's not yours to relinquish. Yes, your honor. We have to have some formal arrangement with everyone who writes anything for a Ballantyre book, which would be retroactively, it would be enormously burdensome tracking these people down. And on a forward looking matter, it would require Ballantyre, which is a two man operation to essentially have in-house counsel to craft agreements to make sure every author knows they are abandoning their copyright by publishing. If my colleagues have additional questions for you. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Henderson, Edwards